**FARHANG & MEDCOFF**

4801 E. Broadway Boulevard, Suite 311
Tucson, Arizona 85711
T: 520.790.5433
F:520.790.5736

Ali J. Farhang (#019456)
afarhang@fmazlaw.com
Roberto C. Garcia (#026246)
rgarcia@fmazlaw.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Virginia R. Morgan, a single woman; David A. Vivaldo, a married man,<br><br>              Plaintiffs,<br><br>       v.<br><br>Freightliner of Arizona, LLC, an Arizona limited liability company; Redgate Arizona, LLC, an Arizona limited liability company; Redgate Partners, LLC, a California limited liability company d/b/a Velocity Vehicle Group; FSWAZ, Ltd. f/k/a Freightliner, Sterling, Western Star of Arizona, Ltd., an Arizona corporation; FAZP, Inc. f/k/a Freightliner, Sterling, Western Star of Arizona, Phoenix, Inc., an Arizona corporation; FAZF, Inc. f/k/a Freightliner of Arizona, Flagstaff, Inc., an Arizona corporation; Danny R. Cuzick and John/Jane Doe Cuzick, spouses; Theril H. Lund and John/Jane Doe Lund, spouses; White Corporations I-X; Black Limited Liability Companies I-X; Gray Partnerships I-X; and John Does I-X and Jane Does I-X and their spouses,<br><br>              Defendants. | No.<br><br><br><br>**COMPLAINT**<br><br>(TRIAL BY JURY DEMANDED) |

00249237.1

Plaintiffs Virginia R. Morgan ("Morgan") and David A. Vivaldo ("Vivaldo"), for their Complaint against Defendants, allege as follows:

**PARTIES, JURISDICTION, AND VENUE**

1.      Morgan is single woman who resides in Arizona.

2.      Vivaldo is a married man who resides in Arizona.  Morgan and Vivaldo are referred to herein, collectively, as "Plaintiffs".

3.      Defendant Freightliner of Arizona, LLC ("FA") is an Arizona limited liability company whose principal place of business is in Arizona.  Freightliner is incorporated under the laws of Arizona and is authorized to conduct business in same.

4.      Defendant Redgate Arizona, LLC ("Redgate") is an Arizona limited liability company whose principal place of business is in Arizona.  Redgate is incorporated under the laws of Arizona and is authorized to conduct business in same.

5.       Defendant Redgate Partners, LLC ("Redgate Partners") is a California limited liability company whose principal place of business is in California.  Redgate Partners is incorporated under the laws of California and is authorized to conduct business in same.  Redgate Partners is not registered as a foreign entity in Arizona and is not authorized to conduct business in same.  Redgate Partners does business as, and presents itself to the public as, Velocity Vehicle Group.

6.      Defendant FSWAZ, Ltd. ("FSWAZ") is an Arizona corporation whose principal place of business is in Arizona.  FSWAZ was formerly known as Freightliner, Sterling, Western Star of Arizona, Ltd.  FSWAZ is incorporated under the laws of Arizona, but is not authorized to conduct business in same.

7.      Defendant FAZP, Inc. ("FAZP") is an Arizona corporation whose principal place of business is in Arizona.  FAZP was formerly known as Freightliner of Arizona, Phoenix, Inc.  FAZP is incorporated under the laws of Arizona and is authorized to conduct business in same.

8.      Defendant FAZF, Inc. ("FAZF") is an Arizona corporation whose principal place of business is in Arizona.  FAZF was formerly known as Freightliner of Arizona, Flagstaff, Inc.  FAZF is incorporated under the laws of Arizona, but is not authorized to conduct business in same.

9.      Defendant Danny R. Cuzick ("Cuzick") is an Arizona resident.  Defendant John/Jane Doe

FARHANG & MEDCOFF

FARHANG & MEDCOFF

Cuzick, who is also an Arizona resident, is the spouse of Cuzick.

10.     At all times relevant to this action, Cuzick and John/Jane Doe Cuzick acted for and on behalf of their marital community.  Each of Cuzick, John/Jane Doe Cuzick, and their marital community is liable to Plaintiffs as alleged herein.

11.     Defendant Theril H. Lund ("Lund") is an Arizona resident.  Defendant John/Jane Doe Lund, who is also an Arizona resident, is the spouse of Lund.

12.     At all times relevant to this action, Lund and John/Jane Doe Lund acted for and on behalf of their marital community.  Each of Lund, Jane Doe Lund, and their marital community is liable to Plaintiffs as alleged herein.

13.     Defendants White Corporations I-X, Black Limited Liability Companies I-X, Gray Partnerships I-X, and John Does I-X and Jane Does I-X and their spouses are unknown persons/entities that may bear some or all responsibility for allegations and/or claims made herein. Plaintiffs refer to FA, Redgate, Redgate Partners, FSWAZ, FAZP, FAZF, Cuzick, Lund, White Corporations I-X, Black Limited Liability Companies I-X, Gray Partnerships I-X, and John Does I-X and Jane Does I-X, and their spouses, collectively (despite the use of the singular form), as "Freightliner".

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 29 U.S.C. § 216(b), 29 U.S.C. § 626, and 42 U.S.C. § 2000e-5.

15.     This Court has supplemental jurisdiction over Plaintiffs' claims arising under Arizona law pursuant to 28 U.S.C. § 1367 because such claims are so related to Plaintiffs' claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

16.     Each defendant named herein or identified by generic designation caused events or omissions in Arizona that gave rise to Plaintiffs' damages and are, for that and other reasons, subject to the personal jurisdiction in this Court.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because all of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

/ / / /

FARHANG & MEDCOFF

## **GENERAL ALLEGATIONS**

### TRANSFER OF BUSINESS INTERESTS

18.     The defendants named herein are all parties to, or involved in some manner presently not fully known to Plaintiffs, in a transaction that closed in February 2015 that purported to transfer ownership and control of FA to Redgate and Redgate Partners (the "Sale").

19.     Through the Sale, the named defendants purported to transfer certain assets, but not liabilities, relating to FA from FSWAZ, FAZP, FAZF, Cuzick, and Lund (collectively, the "Sellers") to Redgate and Redgate Partners (collectively, the "Buyers").

20.     As alleged herein, FA, Plaintiffs' employer for the times relevant and the party primarily liable under Plaintiffs' legal theories, failed to comply with various legal obligations, which resulted in substantial and ongoing damage to Plaintiffs.

21.     Given the Sale, and the purported effects thereof, Plaintiffs are unable to determine whether FA is solely liable for Plaintiffs' damages, or whether the Sellers and Buyers also face liability as a result of their actions and/or omissions relative to the actionable conduct.

22.     Indeed, despite the purported transfers, whether they are fraudulent or not (Plaintiffs have no knowledge or information at this time on this issue), all of FA, Sellers, and Buyers have direct *and* indirect liability, and successor/predecessor liability, under prevailing law for all causes of action alleged herein by Plaintiffs.

23.     As such, Sellers and Buyers are liable to Plaintiffs for all conduct/liability of FA and, regardless of any transfers of interests, or the effects thereof, each of the named defendants (and those potential defendants whose identity is yet to be discovered), are liable to Plaintiffs as alleged herein.

### FLSA / WAGE VIOLATIONS

24.     Morgan began her employment with Freightliner in February 2013.

25.     At all times relevant, Morgan's title was "Customer Service Representative" whose duties included, without limit, greeting customers, advising them in connection with their service needs, coordinating warranty repairs, and serving as the interface between the customer and the actual performance of mechanic labor on a vehicle.

26.     Vivaldo began his employment with Freightliner in January 2014.

27.     At all times relevant, Vivaldo's title was "Customer Service Representative" and his duties were substantially similar to those of Morgan.

28.     From February 2013, through June 2015, Morgan, almost without exception, worked in excess of 40 hours per workweek without receiving wages for all hours worked, without being paid a rate at or above the Arizona and/or federal minimum wages, and/or without receiving overtime compensation as required by federal law.

29.     From January 2014, through May 2015, Vivaldo, almost without exception, worked in excess of 40 hours per workweek without receiving wages for all hours worked, without being paid a rate at or above the Arizona and/or federal minimum wages, and/or without receiving overtime compensation as required by federal law.

30.     At all times relevant, Freightliner wrongfully classified Morgan and Vivaldo as exempt from the overtime pay requirements of the Fair Labor Standards Act ("FLSA").

31.     Freightliner did so in purported reliance on the exemption set forth in 29 U.S.C. § 207(i).

32.     Freightliner, however, with the intentional purpose of wrongfully depriving Plaintiffs of their rights under the FLSA, deemed Plaintiffs exempt from the overtime provisions of the FLSA and indeed failed to pay them wages and overtime wages despite their entitlement to same.

33.     Freightliner could not and cannot rely upon the § 207(i) exemption because, without limit, Freightliner failed to keep the records required under 29 C.F.R. §§ 516.2(a) and 516.16.

34.     Further, Freightliner could not and cannot rely upon the § 207(i) exemption because, without limit, Freightliner failed to comply with the requirements of § 207(i) itself by not ensuring that Plaintiffs received a regular rate of pay in excess of one and one-half times the prevailing federal minimum wage.

35.     Based upon a decision of the United States Supreme Court handed down on June 20, 2016, Freightliner recently claimed it was correct to withhold from Plaintiffs the benefits of the FLSA in 2014 and 2015 under the exemption codified at 29 U.S.C. § 213(b)(10)(A), which relates primarily to salesmen at car/truck dealerships.

36.     Prior to the Supreme Court's aforementioned decision, the prevailing rule in the Ninth

Circuit was that customer service representatives <u>do not</u> qualify as exempt from the FLSA's overtime pay requirements under the § 213(b)(10)(A) exemption.

37.     At present, whether customer service representative qualify for the § 213(b)(10)(A) exemption remains a question of law presently before the Ninth Circuit.

38.     Plaintiffs, however, believe and allege the continuing rule in the Ninth Circuit and under the regulations of the United States Department of Labor (the federal administrative agency charged with the interpretation and enforcement of the FLSA) to be that Plaintiffs' position/work does not qualify for the § 213(b)(10)(A) exemption.

39.     Even if customer service representatives do generally qualify for the § 213(b)(10)(A) exemption, which they do not, Plaintiffs specifically, and the particular work tasks they performed at the times relevant, do not fall under the exemption.

40.     Freightliner's designation of Plaintiffs as customer service representatives is insufficient to apply the § 213(b)(10)(A) exemption, as job titles alone do not determine exempt status.  In order for an FLSA overtime exemption to apply, an employee's specific job duties must meet all the requirements of the exempting statute and regulations.

41.     Plaintiffs' particular and actual job duties do not satisfy the requirements of § 213(b)(10)(A) exemption.

42.     Indeed, during the vast majority of Plaintiffs' work time during the relevant periods, Plaintiffs did not engage in the sales or servicing of parts or vehicles.  In truth, Plaintiffs spent most of their time relaying information to and from clients and on paperwork and recordkeeping.

43.     For this and other reasons, Plaintiffs were never actually exempt from the overtime pay requirements of the FLSA, and Freightliner should have paid them in accordance with the FLSA at all times relevant.

44.     Plaintiffs' number of actual hours worked, together with preliminary calculations reflecting the amounts owed to Plaintiffs for unpaid wages under the various legal provisions set forth below, are set forth in Exhibits A-D, attached hereto and incorporated herein by this reference.

DISCRIMINATION AND RETALIATION AGAINST MORGAN

45.     As of the date of this filing, Morgan continues to be an employee of Freightliner.

FARHANG & MEDCOFF

FARHANG & MEDCOFF

46.     At all times relevant, Morgan has been a hardworking, exemplary employee.  Morgan regularly receives praise regarding her job performance from customers and her fellow employees.

47.     Certain Freightliner employees, however, with the knowledge and acquiescence of Freightliner management, acted abusively and in a manner inconsistent with what should be tolerated in a modern workplace.

48.     For example, and without limit, at the times relevant hereto, supervisor Joshua Lomeli ("Lomeli") consistently acted in a discriminatory manner against Morgan.

49.     At all times relevant Morgan has been a female and over the age of 40.

50.     For no discernable, proper business reason, Lomeli would provide Morgan with inaccurate, unfair reviews of her performance that would, in turn, negatively affect her pay.

51.     Lomeli would so act in order to discriminate against Morgan due to her sex and age.

52.     For no discernable, proper business reason, Lomeli would assign Morgan to undesirable night and weekend shifts where she would receive no assistance to perform her work.  This is in contrast to Lomeli's assignments for younger (under 40) males who were regularly given the more desirable shifts, were given assistance during such shifts, and were constantly praised and rewarded for lesser and inferior work performance.

53.     Lomeli would so act in order to discriminate against Morgan due to her sex and age.

54.     For no discernable, proper business reason, Lomeli required Morgan to perform inordinate amounts of work, sometimes over 80 hours per workweek, at a lesser rate of pay, and less total pay than her younger, male counterparts who were working much less and being much less productive.

55.     Lomeli would so act in order to discriminate against Morgan due to her sex and age.

56.     The instances of discrimination noted above are not all-inclusive.  Indeed, Morgan suffered discrimination because of her age and sex in various other circumstances.

57.     By virtue of being Morgan's supervisor, and given the power he held over Morgan including the power to fire her, his supervision and control of her work schedule and conditions of employment, his power to determine her rate of pay, and his maintenance of employment-related records on her (including reviews that had effect on her pay), Lomeli held economic control or control over the nature and structure of the employment relationship between Freightliner and

Morgan.

58.     At various times through her interactions with Lomeli, Morgan asked Lomeli, one on one and during staff meetings, to explain why she would receive less desirable shifts, more work, more scrutiny, and less pay than her younger, male counterparts.

59.     Morgan asked these questions of Lomeli, among other reasons, to improve her work conditions, to determine the mysterious formula for her pay that resulted in her earning less than those who worked much less, and to determine whether the manner in which Freightliner paid her was in accordance with state and federal law, particularly the FLSA and its overtime pay requirements.

60.     Lomeli's typical response to Morgan's questions and complaints was to tell Morgan to "shut up" and to instruct her not to bring up such issues.  Further, whenever Morgan attempted to obtain information regarding her pay and status and/or make her work circumstances better, Lomeli would retaliate and punish her for doing so by exposing her to even greater scrutiny and giving her even more work.

61.     Morgan made attempts to report Lomeli's conduct and her unfair work conditions to Freightliner's human resources personnel.  Indeed, Morgan attempted to contact Freightliner's director of human resources, Gordon Evans, to no avail.

62.     Lomeli created an ageist and sexist work environment where mistreatment of Morgan was commonplace and something of a sport for Freightliner's unscrupulous employees.

63.     For example, and without limit, Matthew Davidson ("Davidson"), a Freightliner foreman and friend of Lomeli's, would often make improper comments of an unwelcome, sexual, and harassing nature that were outrageous and specifically calculated to embarrass/harm Morgan and marginalize her in the workplace.

64.     In one instance, a female wearing shorts entered the Freightliner Tucson facility where Plaintiffs work(ed).  Davidson asked Morgan who the female was and Morgan, expecting a sex-related comment, responded, "that's a customer." Davidson then told Morgan, referring to the aforementioned female, "I would like to fuck that."  Davidson was aware long before this incident that Morgan did not welcome such crude comments.

65.     When Davidson made this comment, and all those attributed to him herein, Freightliner had provided no non-discrimination / equal employment opportunity training to Plaintiffs or their coworkers at Freightliner's Tucson facility.

66.     In another instance, a customer, in Davidson's presence, was complimenting Morgan on her excellent work and how he would recommend that others use Freightliner on account of Morgan's exemplary customer service.  Davidson, while pointing to his mouth, told Morgan, "Hey Rose [Morgan's middle name], you've got some cum dripping out of your mouth."

67.     In another instance, a customer who was pleased with the service provided by Plaintiffs returned to Freightliner on account of such service.  Vivaldo noted this in the repair order notes. When Davidson read this, he stated, "Why is he happy with your service?  Did you take him in the room and take sexual turns on him?"

68.     Morgan made various attempts to report this conduct to Freightliner human resources personnel.  Freightliner failed to address such issues until Morgan demanded, through counsel, that Freightliner remedy the situation.

69.     At all times relevant, Lomeli was Morgan's supervisor who held economic control over her and, as such, Freightliner is liable for Lomeli's discriminatory and retaliatory conduct.  Similarly, Freightliner is liable for Davidson's discriminatory, harassing conduct.

<u>MORGAN'S RESULTING EMOTIONAL AND PHYSICAL DISTRESS</u>

70.     Freightliner's failure to address the aforementioned circumstances created by it and its employees have caused not only substantial financial loss to Morgan, but also significant emotional and physical distress.

71.     At all times relevant, as a result of the work environment and the circumstances created by Freightliner, Morgan suffered anxiety attacks (accompanied by rapid heart rate, profuse perspiration, and uncontrollable shaking), insomnia, headaches, and depression.

72.     Additionally, the stress caused by Morgan's work conditions at Freightliner arising from the unfair pressure to perform at high levels (which it did not place on her younger, male colleagues) and the long hours she worked (which her younger, male colleagues did not have to work) caused Morgan to suffer various adverse physical symptoms including, without limit, vomiting, stomach

cramps, diarrhea, transient appetite, and unusual menstrual discharge/cramps.

73.    Morgan's aforementioned emotional and physical harm were directly and proximately caused by the long hours, frustration with pay issues, and hostile/retaliatory work conditions at Freightliner.

DISCRIMINATION AGAINST VIVALDO

74.    Like Morgan, at all times relevant, Vivaldo was a hardworking, exemplary employee. Vivaldo regularly received praise regarding his job performance from customers and his fellow employees.

75.    Vivaldo is a Hispanic male of Mexican ancestry.

76.    At all times during his employment with Freightliner, Vivaldo did excellent work and performed according to the standards and expectations of Freightliner.

77.    Despite this, Lomeli, who also had economic control over Vivaldo, discriminated against Vivaldo by giving him less desirable shifts, no assistance, a bigger work load, and, in turn, significantly more work hours with less pay than his counterparts who were not members of any protected class, or no pay at all.

78.    Freightliner and Lomeli perpetrated the aforementioned discrimination against Vivaldo because of his race, color, and/or national origin.

79.    Freightliner and Lomeli, in contrast, treated other employees who are white and not of Hispanic origin more favorably by providing them with more favorable working conditions such as better shifts and assistance from other employees.  There was no discernable, proper business reason for such disparity in treatment.

80.    Such discrimination also affected Vivaldo's pay.  Indeed, because of the discrimination perpetrated primarily by Lomeli, Vivaldo received less pay than his counterparts not part of any protected class, if any pay at all, for certain work.

81.    Despite Vivaldo's excellent work and substantial contributions to Freightliner, Freightliner terminated Vivaldo's employment in May 2015 citing supposed budgetary and over-staffing concerns.

82.    Contrary to the pretext provided by Freightliner for the termination of Vivaldo's

FARHANG & MEDCOFF

employment, Freightliner hired a non-Hispanic male to fill his position. Freightliner did so in an act of outright discrimination against Vivaldo based only on their apparent dislike for Vivaldo's race, color, and/or national origin.

83.     Indeed, there was no actual, discernable, proper business reason for Freightliner's termination of Vivaldo's employment, particularly where Freightliner replaced Vivaldo with the person it did.

<u>VIVALDO'S RESULTING EMOTIONAL AND PHYSICAL DISTRESS</u>

84.     Freightliner's failure to train against and prevent the aforementioned circumstances created by it and its employees, and its unfair, outrageous termination of Vivaldo's employment have caused not only substantial financial loss to Vivaldo, but also significant emotional and physical distress.

85.     At all times relevant, as a result of the work environment and the circumstances created by Freightliner, Vivaldo suffered extreme depression, anxiety and nervousness, and insomnia.

86.     Additionally, the stress Freightliner caused to Vivaldo by providing him with, among other things, race-based unfair treatment, the racially-motivated outrageous termination of his employment despite his excellent work, and the long hours he worked under inordinate pressure caused Vivaldo to suffer various adverse physical symptoms including, without limit, body aches, fatigue, insomnia, headaches, vomiting, diarrhea, and transient appetite.

87.     Vivaldo's emotional and physical harm mentioned above were directly and proximately caused by the long hours, frustration with pay issues, and hostile work conditions at Freightliner.

<u>TOLLING AGREEMENT</u>

88.     Plaintiffs and each of FA, Redgate, Redgate Partners, FSWAZ, FAZP, FAZF, Cuzick, and Lund entered into that certain Second Tolling Agreement with an effective date of April 22, 2016 (the "Tolling Agreement").

89.     The parties to the Tolling Agreement agreed, among other things, that any and all claims filed by Plaintiffs between July 15, 2016, and July 31, 2016, would be considered timely and that the defending parties would not "assert a laches defense or any other time-based doctrine or defense, rule, or statute, that could limit the [Plaintiffs'] right to assert, preserve, and or prosecute

any of the Claims [as defined]."

90.     Each of the claims asserted herein is subject to the Tolling Agreement and, as such, Freightliner has, among other things, waived any right to any time-based objection or defense against Plaintiffs' claims.

**COUNT I – FAIR LABOR STANDARDS ACT**

91.     Plaintiffs incorporate herein by this reference each and every preceding allegation as though fully set forth herein.

92.     At all times relevant, Freightliner has been and continues to be, an employer engaged in interstate commerce.

93.     For each year from 2013 through the present, Freightliner realized gross revenues far in excess of $500,000.

94.     At all times relevant, Freightliner has been and continues to be, subject to the provisions of the FLSA, which is codified at 29 U.S.C. § 201, et seq.

95.     At all times relevant, Plaintiffs were subject to the benefits and protections of the FLSA, and no FLSA exemption applied to them.

96.     In willful violation of the FLSA, 29 U.S.C. §§ 206, 215, and 216 (and the related regulations), Freightliner failed to pay Plaintiffs the applicable minimum rate for each hour worked.

97.     In willful violation of the FLSA, 29 U.S.C. §§ 207, 215, and 216 (and the related regulations), Freightliner failed to pay Plaintiffs the applicable overtime rate for all hours worked in excess of 40 hours per workweek.

98.     In willful violation of the FLSA, 29 U.S.C. §§ 215(a)(3) and 216 (and the related regulations), Freightliner, through Lomeli's actions, retaliated against Morgan for her complaints and inquiries regarding Freightliner's failure to comply with 29 U.S.C. §§ 206, 207, 215, and 216.

99.     All of Freightliner's violations of the FLSA complained of herein were willful and specifically calculated to deprive Plaintiffs and other Freightliner employees of compensation due under law, to the end of enriching Freightliner and/or diverting pay to Freightliner's and Lomeli's preferred employees.

100.    All of Freightliner's violations of the FLSA were willful such that "a cause of action arising

out of a willful violation may be commenced within three years after the cause of action accrued." See 29 U.S.C. § 255(a).  Accordingly, at a minimum, Plaintiffs are entitled to their damages incurred starting from 3 years prior to this filing.

101.    Based upon the Tolling Agreement, however, Plaintiffs are entitled to make this claim for all their damages regardless of when such claim arose, and to recover on same.

102.    For the relevant period, Plaintiffs' actual minimum hourly rate can be calculated based upon Plaintiffs' records reflected in Exhibits A-D.  Freightliner is liable to Plaintiffs for each instance in which Plaintiffs were paid at a rate under the prevailing federal minimum wage.

103.    Based upon Plaintiffs' records, the number of hours Plaintiffs worked in in excess of 40 hours per workweek during the relevant period is set forth in Exhibits A-D.  Plaintiffs did not receive one and one-half their prevailing regular rate for such work, which violates the FLSA.

104.    Freightliner, in an effort, without limit, to preclude Plaintiffs from determining their proper compensation due under law, in willful violation of 29 U.S.C. §§ 211, 215, and 216 (and the related regulations) failed to maintain records relating to the hours worked by Plaintiffs and, as such, Freightliner has no records to challenge the accuracy of Plaintiffs' records.

105.    Pursuant to 29 U.S.C. § 216(b), Freightliner is liable to Plaintiffs in an amount equal to the amount Freightliner failed to pay Plaintiffs as required by the FLSA, plus liquidated damages in an amount equal to the amount Freightliner wrongfully failed to pay, plus attorneys' fees and costs.

106.    Pursuant to 29 U.S.C. § 216(b), Plaintiffs are entitled to injunctive or other relief necessary to remedy the harm caused by Freightliner's violation of 29 U.S.C. § 215(a)(3) including without limit, restoration of employment and/or promotion.

107.    Further, because Freightliner's violations of the FLSA—and because Freightliner's retaliatory actions against Morgan for seeking to protect and vindicate her rights under the FLSA— were gross, wanton, malicious, oppressive, and done with spite, ill will, and reckless indifference to the interests of others, and because Freightliner's conduct evinces an evil hand guided by an evil mind, Plaintiffs are entitled to punitive damages under the FLSA, in addition to all other damages, in an amount to be proven at trial.

/ / / /

FARHANG & MEDCOFF

FARHANG & MEDCOFF

## COUNT II – TITLE VII / ARIZONA CIVIL RIGHTS ACT

108.    Plaintiffs incorporate herein by this reference each and every preceding allegation as though fully set forth herein.

109.    Freightliner and its employees engaged in discrimination made unlawful under Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e, et seq. ("Title VII"), and the Arizona Civil Rights Act, codified at A.R.S. § 41-1461, et seq. (the "ACRA") through their improper treatment of Plaintiffs.

110.    Title VII and the ACRA make it unlawful for an employer such as Freightliner to "fail to refuse to hire or to discharge an individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

111.    Morgan is female and thus a member of a protected class under Title VII and the ACRA due to her sex.

112.    At all times relevant, Morgan performed according to Freightliner's legitimate employment expectations and, indeed, was and is recognized as an excellent employee.

113.    Freightliner and its employees treated Morgan in a less favorable manner than it treated males because of her sex.  For example, Freightliner gave Morgan less desirable shifts, provided her with no assistance despite a heavy workload, paid her less, failed to pay her for certain work at all, was given negative reviews for no proper reason, was marginalized and made to feel inferior, and generally treated poorly, all on account of her sex.

114.    In contrast, Morgan's male counterparts were provided the more desirable shifts, provided with additional assistance despite having much less work than Morgan, were paid more, were generally treated very favorably and never disciplined.

115.    Morgan would have received such preferred and favorable treatment but for her sex.

116.    Freightliner paid and treated Morgan as lesser-than her male counterparts with discriminatory motive and with the intention to harm Morgan because of her sex, all in an effort to better position Morgan's male counterparts, at her expense, for promotions and better pay.

117.    Further, Freightliner and its employees created a sexually hostile work environment because

FARHANG & MEDCOFF

1   of Morgan's sex, and illegally subjected her to same.  For example, Morgan, the only female on the

2   Freightliner (Tucson facility) service/repair team, was consistently exposed to demeaning and/or

3   unwelcome sex-related comments such as when Davidson, a foreman with Freightliner with

4   supervisory authority, told Morgan she had "cum dripping out of [her] mouth" after she received

5   praise from a client.

6   118.   Morgan was consistently on the receiving end of mistreatment and/or demeaning comments

7   by Davidson, Lomeli, and Freightliner.  Indeed, Morgan was made to feel like she could do nothing

8   right, based on nothing other than discrimination and hostility toward her for being female, despite

9   her being the most productive customer service representative.

10   119.   The sexually hostile work environment Morgan was exposed to at Freightliner was

11   permeated with discriminatory intimidation and sexual overtones, was intolerable, and severe.  The

12   hostile acts and environment Morgan faced were so pervasive, indeed she felt their effects on a

13   daily basis, such that Morgan's conditions of employment were negatively altered, and such that

14   any reasonable person would consider same abusive and utterly unacceptable.

15   120.   Morgan subjectively perceived her workplace environment to be offensive, hostile, and

16   abusive, and any objective, reasonable person would agree.

17   121.   The discrimination Morgan faced because of her sex was purposeful, calculated, and

18   intended to keep Morgan from advancing or enjoying a peaceful and welcoming work environment.

19   122.   Vivaldo is Hispanic and of Mexican descent and thus a member of protected classes under

20   Title VII and the ACRA due to his race, color, and national origin.

21   123.   Freightliner and its employees treated Vivaldo in a less favorable manner than it treated his

22   white counterparts not of Hispanic origin because of his race, color, and/or national origin.  For

23   example, Freightliner gave Vivaldo less desirable shifts, provided him with no assistance despite a

24   heavy workload, paid him less, failed to pay him for certain work at all, was given negative reviews

25   for no proper reason, was marginalized and made to feel inferior, was generally treated poorly all

26   on account of his race, color, and (perceived) national origin, and ultimately Freightliner terminated

27   his employment for same.

28   124.   In contrast, Vivaldo's counterparts who were not part of any obviously perceptible protected

FARHANG & MEDCOFF

class were provided the more desirable shifts, provided with additional assistance despite having much less work than Vivaldo, were paid more, were generally treated very favorably and never disciplined.

125.    Vivaldo would have received such preferable and favored treatment but for his race, color, and/or national origin.

126.    At all times relevant, Vivaldo performed according to Freightliner's legitimate employment expectations and, indeed, was often recognized as an excellent employee.  There was no question Vivaldo was qualified for, and performing well in, the position he held with Freightliner.

127.    Despite his excellent work and service to customers, Freightliner terminated Vivaldo's employment for no proper, discernable business reason.

128.    Freightliner claimed it terminated Vivaldo's employment due to budget concerns and overstaffing issues.  This was mere pretext, as Freightliner hired another individual to replace Vivaldo and take his position.

129.    Contrary to Freightliner's pretext, Freightliner wrongfully terminated Vivaldo's employment in order to replace him with the type of employee apparently favored by Freightliner, a white, non-Hispanic individual who appears not to be a member of any protected class.

130.    To Plaintiffs' knowledge, Freightliner treated other employees not in any protected class more favorably than Vivaldo, and Freightliner did not terminate the employment of any other employee in order to address the supposed budget concerns and overstaffing issues.

131.    Freightliner treated Vivaldo less favorably than his similarly situated counterparts and terminated his employment with the intent to discriminate against him and cause him harm for no legitimate reasons other than, or because of, his race, color, and/or national origin.

132.    Despite diligent search, Vivaldo has been unable to find employment that compensates him in a manner equivalent to what he was earning while employed by Freightliner.

133.    Freightliner's conduct with regard to Vivaldo is intolerable, severe, racially hostile, purposeful, calculated, and intended to keep Vivaldo, a Hispanic man of Mexican descent, from advancing or enjoying a peaceful and welcoming work environment.

134.    Freightliner's and its employees' conduct complained of herein are violations of Title VII

and the ACRA, which entitle Plaintiffs to damages under law.

135.    Morgan timely filed a charge of discrimination with the EEOC relating to the matters complained of herein.

136.    On June 27, 2016, the EEOC (at Morgan's request) issued Morgan a Notice of Right to Sue in connection with Freightliner's violations of Title VII and the ACRA.

137.    Vivaldo timely filed a charge of discrimination with the EEOC relating to the matters complained of herein.

138.    On June 24, 2016, the EEOC issued Vivaldo a Notice of Right to Sue in connection with Freightliner's violations of Title VII and the ACRA.

139.    The filing of Morgan's and Vivaldo's Title VII and ACRA claims are timely under law and the Tolling Agreement.

140.    Freightliner's unlawful treatment of Plaintiffs has caused Plaintiffs substantial damage. Plaintiffs are entitled to all damages recoverable under Title VII and the ACRA including, without limit, those damages arising from wages and benefits not paid for discriminatory reasons, emotional distress and mental anguish, inconvenience, plus interest thereon, and attorneys' fees and costs incurred herein and otherwise incurred by Plaintiffs in seeking to vindicate their rights.

141.    Plaintiffs are further entitled to preliminary and permanent injunctive relief against Freightliner under Title VII and the ACRA in the form of, among other things, reinstatement of Vivaldo's employment, benefits, seniority, and back-pay.  Alternatively, Freightliner is liable for Vivaldo's front pay in an amount considered reasonable by the Court.

142.    Additionally, Plaintiffs are entitled to preliminary and/or permanent injunctive relief ordering Freightliner to implement policies against discrimination, ordering Freightliner to cease wrongful conduct in violation of the Title VII and the ACRA, ordering Freightliner to remedy all disparate treatment of other workers in violation of Title VII and the ACRA, and requiring all of Freightliner's employees to undergo equal opportunity training.

143.    Freightliner's disparate treatment of Plaintiffs over those more favored individuals or classes of individuals, and the sexually hostile work environment it created and allowed to fester with regard to Morgan, was gross, wanton, malicious, oppressive, and done with spite, ill will, and

1   reckless indifference to the interests of others.  Further, Freightliner's conduct evinces an evil hand

2   guided by an evil mind.  As a result, Freightliner is liable to Plaintiffs for punitive damages, in

3   addition to all other damages, in an amount to be proven at trial.

4   **COUNT III – EQUAL PAY ACT**

5   144.    Plaintiffs incorporate herein by this reference each and every preceding allegation as though

6   fully set forth herein.

7   145.    As set forth elsewhere herein, Freightliner is subject to the provisions of the FLSA, codified

8   at 29 U.S.C. § 201, et seq., and the related regulations promulgated thereunder.

9   146.    Freightliner, in willful violation of the Equal Pay Act (codified at 29 U.S.C. § 206(d)) (the

10   "EPA"), paid and continues to pay Morgan wages at a rate less than the rate it paid or pays male

11   employees for equal work (if not more work on the part of Morgan) on jobs that require(d) at least

12   equal skill, effort, and responsibility under the same or similar working conditions at Freightliner's

13   Tucson facility, and elsewhere in Arizona.

14   147.    Freightliner also willfully violated the EPA, through Lomeli's actions, when it retaliated

15   against Morgan for her complaints and inquiries regarding Freightliner's failure to pay her fairly

16   and/or the same as men performing the same work under the same or similar working conditions at

17   Freightliner's Tucson facility, and elsewhere in Arizona.

18   148.    For example, at all times relevant, Morgan has understood and believed Freightliner paid

19   and pays males in the exact same position as Morgan, if not substantially similar positions, wages

20   at a rate higher rate per hour than it pays Morgan under the same or similar working conditions at

21   Freightliner's Tucson facility, and elsewhere in Arizona.

22   149.    Pursuant to 29 U.S.C. § 216(b), Freightliner's violation of the EPA, and its retaliation

23   against Morgan for seeking to protect and vindicate her rights under the EPA, damaged Morgan,

24   during the entire time Morgan has worked for Freightliner, in an amount not less than the difference

25   between Morgan's pay and the pay of those employees of the opposite sex who received greater

26   pay, plus an amount equal to such an amount as liquidated damages.  Such pay includes, without

27   limit, compensation of all forms including hourly wages, commissions, bonuses, and benefits.

28   150.    Morgan is entitled to an order from this Court directing Freightliner to increase Morgan's

FARHANG & MEDCOFF

FARHANG & MEDCOFF

1   total pay/compensation to an amount commensurate with that of male employees who perform

2   substantially similar work under substantially similar circumstances.

3   151.   Freightliner is also liable under the EPA for Morgan's compensatory damages (including

4   emotional distress), Morgan's attorneys' fees and costs incurred herein, and for punitive damages,

5   as Freightliner's conduct was gross, wanton, malicious, oppressive, and done with spite, ill will,

6   and reckless indifference to the interests of others.  Further, Freightliner's relevant conduct evinces

7   an evil hand guided by an evil mind.

8   **COUNT IV – AGE DISCRIMINATION IN EMPLOYMENT ACT / ACRA**

9   152.   Plaintiffs incorporate herein by this reference each and every preceding allegation as though

10   fully set forth herein.

11   153.   Freightliner violated the Age Discrimination in Employment Act (the "ADEA"), codified

12   at 29 U.S.C. § 621, et seq., and the ACRA by discriminating against Morgan on the basis of her

13   age.

14   154.   At all times relevant, Morgan was over the age of 40.

15   155.   Morgan timely filed a charge of discrimination with the EEOC relating to the matters

16   complained of herein.

17   156.   On June 27, 2016, the EEOC (at Morgan's request) issued Morgan a Notice of Right to Sue

18   in connection with Freightliner's violations of the ADEA and ACRA.

19   157.   The filing of this cause of action is timely under law and the Tolling Agreement.

20   158.   Freightliner discriminated against and marginalized Morgan by treating younger, similarly

21   situated employees more favorably.

22   159.   For example, Freightliner, through Lomeli, treated younger employees more favorably by

23   assigning them fewer tasks, more desirable schedules, more assistance from other employees, and

24   by providing them more pay for less work.

25   160.   There was no discernable, appropriate business reason for the age discrimination endured

26   by Morgan, who suffered damages thereby.

27   161.   Morgan's damages arising from Freightliner's violations of the ADEA and ACRA include,

28   without limit, past and future lost wages and benefits, attorneys' fees and costs incurred herein,

1    and, because Freightliner's conduct complained of herein was willful, Freightliner is liable for

2    liquidated damages in an amount equal to Morgan's past and future lost wages and benefits.

3    ## COUNT V – A.R.S. § 23-355

4    162.   Plaintiffs incorporate herein by this reference each and every preceding allegation as though

5    fully set forth herein.

6    163.   At all times relevant, Plaintiffs reasonably expected Freightliner to compensate Plaintiffs

7    for their work in a manner that was fair and compliant with Arizona and federal law.  Such expected

8    compensation was not discretionary.

9    164.   Freightliner, without any appropriate business reason, refused and failed to compensate

10   Plaintiffs for the work they performed on Freightliner's behalf.  Without limit, this was contrary to

11   Plaintiffs' reasonable expectations that they be paid for their work and time spent advancing

12   Freightliner's interests.

13   165.   For example, during the relevant periods, Freightliner failed to pay Plaintiffs for the hours

14   they worked in any workweek past 40 hours.  Indeed, Plaintiffs received no compensation, or not

15   enough compensation, for any of the time they worked over 40 hours in any of the workweeks at

16   issue, as reflected in Exhibits A-D.

17   166.   Further, on several occasions, Plaintiffs also did not receive enough compensation, in

18   accord with their reasonable expectations, for the hours they worked under 40 hours in the

19   workweeks at issue.

20   167.   Plaintiffs were entitled to payment based upon, among other things, them actually spending

21   their time advancing Freightliner's interests as employees and their reasonable expectation to be

22   compensated therefor.

23   168.   Freightliner violated Arizona law by failing to pay Plaintiffs their wages due.

24   169.   Pursuant to A.R.S. § 23-355, Freightliner is liable to Plaintiffs for an amount equal to

25   Plaintiffs' treble damages, or three times Plaintiffs' wrongfully unpaid wages.

26   ## COUNT VI – ARIZONA MINIMUM WAGE ACT

27   170.   Plaintiffs incorporate herein by this reference each and every preceding allegation as though

28   fully set forth herein.

FARHANG & MEDCOFF

171.    During their employment with Freightliner, Plaintiffs, during several weeks, worked a substantial amount of hours past 40.  Freightliner, however, did not pay Plaintiffs for this additional labor.

172.    Given Plaintiffs' substantial number of work hours and Freightliner's failure to pay Plaintiffs for such additional hours, Plaintiffs' total hourly compensation from time to time fell below the prevailing Arizona minimum wage in violation of A.R.S. §§ 23-362, 363, and 364.

173.    Freightliner failed to maintain records of the amount of time Plaintiffs worked, as required by Arizona law.  Accordingly, pursuant to A.R.S. § 23-364 and based upon Plaintiffs' records attached hereto as Exhibits A-D, a rebuttable presumption arises under Arizona law that Freightliner did not pay Plaintiffs the required minimum wage.

174.    As a result of Freightliner's violation of the Arizona Minimum Wage Act, pursuant to A.R.S. § 23-364, Plaintiffs are entitled to the balance of wages unpaid and owed in an amount to be determined at trial, plus interest thereon, plus an additional amount equal to twice the unpaid wages, plus their attorneys' fees and costs incurred herein.

## COUNT VII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

175.    Plaintiffs incorporate herein by this reference each and every preceding allegation as though fully set forth herein.

176.    During their employment with Freightliner, Plaintiffs have endured consistently harsh, stressful, and demeaning circumstances that caused them substantial emotional distress and resulting physical harm/injuries.

177.    For example, Morgan was exposed to conduct by Freightliner and its employees that was extreme and outrageous including, without limit, the resulting totality of the circumstances created by Freightliner and brought forth by Morgan being told she had "cum dripping out of [her] mouth", by her constant marginalization for being a woman, and the constant, unfair fear she endured that her employment would be terminated despite her high productivity and relatively lower pay.

178.    For example, Vivaldo was exposed to conduct by Freightliner that was extreme and outrageous when Freightliner terminated Vivaldo's employment for no reason and then replaced him with another individual who is not apparently a member of any protected class.

FARHANG & MEDCOFF

179.   In both of the aforementioned instances, Freightliner's conduct was extreme and outrageous.  Indeed, Freightliner's and its employees' acts were so outrageous in character and extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.

180.   Freightliner and its employees intended to cause severe emotional distress to Plaintiffs; they seemingly enjoyed it.  At a minimum, Freightliner and its employees recklessly disregarded the near certainty that their offensive conduct would result in emotional distress to Plaintiffs.

181.   Plaintiffs suffered severe emotional distress as a direct and proximate cause of Freightliner's and its employees' conduct.  As noted above, Plaintiffs suffered and continue to suffer various emotional consequences such as anxiety, depression, and insomnia.

182.   The severe emotional distress suffered by Plaintiffs also resulted in severe physical harm/injury to Plaintiffs including, without limit, uncontrollable shaking, diarrhea, cramps, headaches, and, with regard to Morgan, unusual menstrual discharge.

183.   Freightliner's and its employees' conduct with respect to Plaintiffs was gross, wanton, malicious, oppressive, and done with spite, ill will, and reckless indifference to the interests of others.  Further, Freightliner's and its employees' conduct evinces an evil hand guided by an evil mind.  As a result, Freightliner is liable to Plaintiffs for punitive damages, in addition to all other damages, in an amount sufficient to punish Freightliner and deter others from engaging in such conduct in the future.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues and claims so triable.

**WHEREFORE**, Plaintiffs respectfully requests that the Court:

a)      Enter judgment for Plaintiffs and against Freightliner on all counts;

b)      Award Plaintiffs all recoverable damages, in an amount to be proven at trial;

c)      Award Plaintiffs all liquidated damages as provided and/or allowed by law;

d)      Award Plaintiffs punitive and/or exemplary damages on all claims under which such damages are available under law in an amount to be determined at trial;

e)      Award Plaintiffs their attorneys' fees and costs incurred herein, on all the bases

upon which such expenditures are compensable to Plaintiffs alleged herein;

f)      Grant Plaintiffs the injunctive relief requested herein and/or available under law;

g)      Award Plaintiffs pre- and post-judgment interest at the highest rate allowed by law; and

h)      Award Plaintiffs any other relief that the Court deems just and proper under circumstances.

DATED this 28th day of July, 2016.

FARHANG & MEDCOFF

By /s/Roberto C. Garcia
    Ali J. Farhang
    Roberto C. Garcia
    Attorneys for Morgan and Vivaldo

FARHANG & MEDCOFF